1
2
3
4
5
6
7
8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE NORTHERN DISTRICT OF CALIFORNIA

10
11

LARRY DOUGLAS, AE2986,

No. C 13-4655 CRB (PR)

12

Petitioner,

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS**

13

v.

14

R. T .C. GROUNDS, Warden,

15

Respondent.

16

_____/

17          Petitioner, a prisoner at Salinas Valley State Prison proceeding pro se, seeks a writ of

18   habeas corpus under 28 U.S.C. § 2254 challenging a conviction and sentence from Santa

19   Clara County Superior Court.  For the reasons set forth below, the petition will be denied.

20                                    **STATEMENT OF THE CASE**

21          On March 4, 2010, a jury convicted Petitioner of two counts of attempted first-degree

22   murder, two counts of assault with a firearm, one count of pimping and one count of

23   pandering (procuring a person for prostitution), pursuant to the California Penal Code.  The

24   trial court also found that Petitioner had a prior felony strike conviction and had served a

25   prior prison term.  Petitioner was sentenced to a total term of life consecutive to 58 years in

26   state prison.

27          On June 20, 2012, the California Court of Appeal affirmed the judgment of the trial

28   court and, on October 10, 2012, the California Supreme Court denied review.

*United States District Court*
*For the Northern District of California*

On October 7, 2013, Petitioner filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in this Court, which he amended shortly thereafter.  Per order filed on December 17, 2013, the Court found that the operative petition, when liberally construed, stated cognizable claims under § 2254 and ordered Respondent to show cause why a writ of habeas corpus should not be granted.  On May 5, 2014, after the Court granted an extension of time, Respondent filed an answer and, on June 26, 2014, Petitioner filed a traverse.

## STATEMENT OF FACTS

The California Court of Appeal summarized the facts of the case as follows:[1]

Muhamad Sagier and Jason Wilson were friends who lived in a two-bedroom apartment together in San Jose. The two bedrooms in the apartment were off of a hallway, with Sagier's being the first one down the hallway and Wilson's being the second one.

On April 8, 2007, Sagier and Wilson discussed "call[ing] some girls to come over." Wilson had communicated with a woman on MySpace, and she had told him that she was a prostitute with an advertisement on Craigslist. She told him that she would "come hang out after she got off whatever—her prostitution job or whatever." Wilson and Sagier looked at the woman's Craigslist ad and saw that it listed prices of "$60 half-hour or $120 an hour" for prostitution services. Sagier "had like no cash" and no means to pay a prostitute. Nevertheless, he "wanted to see what was going to happen" if they called one of these prostitutes. Wilson also had no money.

Sagier called this woman on his cell phone at about 8:00 p.m. and arranged for her to come to their apartment. An hour later, Lalonnie Torres arrived at their apartment. She "didn't look like a prostitute or anything" but "like kind of a regular girl." Torres had a "friendly conversation" with them in the living room of the apartment and played with their dog. The subject of sex never came up, and Torres left after half an hour without asking for any payment.

About an hour and a half later, either Sagier or Wilson called a second prostitute, again using Sagier's cell phone. One or both of them texted this woman that they would pay $20 for a "blow job." Around midnight, Virginia Hildebrand arrived at their apartment. Sagier invited her into their apartment,

---

[1]Petitioner had a co-defendant, Andre Dee Scott (hereinafter "Scott"), who was also convicted of two counts of attempted murder and two counts of assault with a firearm.  People v. Scott, No. H035845, 2012 WL 2343268, at *1 (Cal. Ct. App. June 20, 2012).  Petitioner and Scott brought identical claims on appeal.

and she came in. However, she "was very like nervous, like kind of weird." She seemed "kind of uncomfortable" and looked "scared." Hildebrand asked: "'[W]ho else is here? Who else lives in the house?' " Sagier told her that it was just himself and Wilson. Hildebrand left after about 15 minutes.

Sagier went into the living room and started watching a movie; Wilson was in his bedroom. About 15 to 30 minutes after Hildebrand left, Sagier heard knocking on the front door of the apartment. He opened the door. At the door were two men in their 30's standing side by side, close together. The shorter one had a "very unique hoodie" sweatshirt on and was wearing a white rubber glove, while the taller one was wearing a "black beanie." The sweatshirt was "red and yellow and had like patches or little things" and "designs" on it. The man wearing the sweatshirt was [Petitioner]. The taller one who was wearing a beanie was Scott. The two men walked into the apartment, and Scott locked the front door behind them. [Petitioner] said, " 'Is there a problem?' " and pulled out a black gun.

Sagier immediately ran down the hallway to his bedroom, slammed his bedroom door, jumped on the bed, and tried to escape through the window. Sagier thought that he had locked the door to his bedroom, but he was not certain. The door was kicked open, and [Petitioner] and Scott appeared in the doorway. [Petitioner] pointed a gun at Sagier and started shooting. Sagier ducked and put an arm over his face. He felt "bullets going around me," and he was struck in the upper right thigh and fell down. After Sagier fell, he heard about four more shots. Sagier lost consciousness for about five minutes.

Wilson, who had heard the knocking at the door, opened his bedroom door and saw Sagier, with "fear in his eyes," run into Sagier's bedroom. Wilson closed and locked the door to his bedroom. He "heard rounds of gunfire" inside the apartment that sounded to him like a large caliber automatic handgun. Wilson took up a position behind his bedroom door with his hand on the doorknob and his foot on the bottom of the door to prevent it being kicked in. Wilson felt someone trying to turn the doorknob. A few seconds later, he heard a gunshot, and a bullet came through his bedroom door about a foot above the doorknob and struck him in the left shoulder. Wilson heard another gunshot, and a second bullet came through his bedroom door at about the same height and struck him in the face and grazed his hand. Wilson screamed: "'Oh, shit. I got shot.'" After he said that, he heard the sound of footsteps running away. Wilson never saw who had entered the apartment, but the footsteps sounded like there was more than one person.

When Sagier came to, he heard footsteps and he heard Wilson say " 'Mo, I've been shot.' " Both Sagier and Wilson called the police, and the police soon

arrived. Three .22 caliber shell casings and five .40 caliber shell casings were found in the apartment. A .40 caliber bullet is about twice the size of a .22 caliber bullet. The .40 caliber bullets had been fired from a .40 caliber Smith & Wesson or Glock semi-automatic handgun, and the bullet fragments recovered established that the .40 caliber bullets were "'jacketed hollow point'" bullets. Two of the .22 caliber casings and two of the .40 caliber casings were found "in the hallway area" outside the door of Sagier's bedroom. Another .22 caliber casing was found just inside Sagier's bedroom. Another .40 caliber casing was found in front of the threshold of Sagier's bedroom. One .40 caliber casing was found in the hallway area in front of Wilson's bedroom. One .40 caliber casing was found in the bathroom, which was at the end of the hallway.

The police traced the phone numbers for the two prostitutes to a cell phone subscriber identified as "Slim Williams" with a birthdate of May 29, 1981, and an address that had previously been [Petitioner]'s home address. [Petitioner]'s birthdate is May 29, 1981, and he was known to use the name "Slim Williams." A few weeks after the shooting, the police traced Hildebrand to a Mountain View motel, where they saw her make contact with [Petitioner]. The police saw Hildebrand leave the motel in a car with [Petitioner], Torres, and another female, and they stopped the car. The occupants of the car were arrested. Hildebrand had a tattoo on her back that said "Lotto" and had a dollar sign with the initials "L.D." on it. Torres had a tattoo on her breasts that said " 'Larry aka Lotto.' " The other female in the car, Carla Pennix, had tattoos on her stomach of the initials "LD," the word "Lotto," and a representation of "playing cards." [Petitioner] also goes by his initials, "L.D."

Three cell phones associated with the two prostitutes and "Slim Williams" were found on the occupants of the car in addition to three other cell phones. [Petitioner] had three cell phones on his person. On the screen of one of the phones in [Petitioner]'s possession, it said " 'Money over bitches.' " A cell phone on Torres's person had a picture of [Petitioner] on it, and the carrying case for that phone bore the word "'Pimp.'" Torres's phone was one of those on the "Slim Williams" account.

A search of [Petitioner]'s home turned up the distinctive sweatshirt that he had been wearing at the time of the shooting, a partially used box of white latex gloves, and a cash box containing $2,400. Gunshot residue was found on the right wrist area of the sweatshirt.

[Petitioner] made a series of telephone calls from jail, which were tape-recorded. Shortly after his arrest, [Petitioner] telephoned his girlfriend, Chante Surrency, who lived with him, and asked her to help dispose of evidence. [Petitioner] also telephoned Pennix, with whom he was also romantically

involved, and enlisted her help for the same purpose. [Petitioner] asked her to "go look for" the guns in his backyard, but he used the word "plasmas" to refer to the guns. [Petitioner] also asked Scott, his close friend since childhood, to go to [Petitioner]'s house "ASAP" and "dig up the TV's that were buried in his backyard." Petitioner said that there were "[t]wo televisions" buried in his backyard. Petitioner asked Scott and Pennix to work together in this endeavor. During a subsequent telephone conversation, Scott told [Petitioner] that he had disposed of the "TV's that were buried in the backyard." Scott subsequently contacted Pennix to let her know that "he found what he was looking for in the backyard." Scott gave her a heavy bag to take away. She subsequently gave the bag back to Scott. After Scott was arrested, he telephoned Corina Scott, his then-girlfriend and subsequent wife, from jail and asked her to help destroy evidence.

Sandra (or Sancia) McNulty, who has an "L.D." tattoo on her breast, told the police that Hildebrand and Torres were prostitutes who worked for [Petitioner]. Pennix confirmed that [Petitioner] sometimes stayed at hotels rather than at his house "[b]ecause he was pimping girls." She knew that these girls were engaging in prostitution and providing him with some of the proceeds from their prostitution. Pennix identified Torres and Hildebrand as two of the prostitutes who worked for [Petitioner]. Pennix sometimes drove Torres and Hildebrand to their "dates." [Petitioner] would pay for the cost of the rental cars that Pennix used to provide this transportation.

Pennix told the police that she had driven Torres to Sagier and Wilson's apartment on April 8, 2007. Between 30 minutes and an hour later, [Petitioner] telephoned Pennix and screamed at her to go back and pick up Torres. Pennix did so. Torres told Pennix that "the guys, two guys, had tried to kidnap her, and they had taken her to some abandoned building." Pennix took Torres to [Petitioner]'s house. They did not go into the house. [Petitioner] and Scott came out of the house and got into the car. Pennix drove the four of them to a motel in Mountain View where Hildebrand was staying. They went up to Hildebrand's motel room. Hildebrand told them that she had received a "call for service" from "the same people" who Torres had accused of trying to kidnap her. She had reached this conclusion because the call came from the same telephone number. [Petitioner] compared the cell phones of Torres and Hildebrand and confirmed that the two calls had come from the same number. [Petitioner] was "a little agitated," and he said "nobody tries to take one of my bitches." He told Hildebrand to "make the date." Hildebrand called and arranged to go to Sagier and Wilson's apartment.

Pennix then drove Hildebrand, [Petitioner], and Scott back to the apartment building where she had taken Torres. Pennix parked the car, and [Petitioner] told Hildebrand to "go inside and leave her phone open and call him and leave

it on speaker so he could hear." Hildebrand did so. She went toward the apartment building, and the rest of them stayed in the car and listened to [Petitioner]'s phone. They could hear Hildebrand go into the apartment and ask how many people were in the house and "discussing a blow job." "[T]hey only had $20, and she couldn't do it for $20." Hildebrand left the apartment and returned to the car. She complained: "[C]an you believe they wanted me to do a blow job for $20." [Petitioner] asked her for the location of the apartment, and she provided it. Scott and [Petitioner] got out of the car and proceeded toward the apartment. Hildebrand and Pennix remained in the car.

About "seven to ten minutes later," Pennix heard "[a] lot" of gunshots. Pennix started the car and saw Scott and [Petitioner] "running out." Both men were wearing white latex gloves, and each of them had a gun in his hand. Scott and [Petitioner] "jumped" into the car. Pennix was "in shock," and Hildebrand was "hysterically screaming, crying." Pennix drove them back to [Petitioner]'s house. During the drive, both men threw their gloves out of the car's windows. The two men went into [Petitioner]'s house for 15 to 20 minutes, while the women waited in the car. The two men emerged from the house, and Scott got into another car and drove away.

A couple of days after the shooting, [Petitioner] and Pennix took Hildebrand and Torres to Tracy. [Petitioner] and Pennix returned to San Jose.

People v. Scott, No. H035845, 2012 WL 2343268, at **2-4 (Cal. Ct. App. June 20, 2012) (footnotes omitted).

### STANDARD OF REVIEW

This Court may entertain a petition for a writ of habeas corpus on "behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

6

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in Supreme Court holdings (as opposed to the dicta) as of the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

### CLAIMS & ANALYSIS

Petitioner raises several grounds for relief under § 2254, which can be grouped into four claim categories: (A) improper jury instruction; (B) prosecutorial misconduct; (C) insufficiency of the evidence; and (D) cumulative error. See Pet. (dkt. 1). The Court will address each of the claim categories in the foregoing order.

/

A.      Improper Jury Instruction

Petitioner claims two instances of improper jury instruction.  First, Petitioner claims that the court gave the jury an erroneous response to a question regarding an element of an offense.  Pet. at 7.  Second, Petitioner claims that the court erred by not providing an accomplice instruction as to one of the witnesses.  Id. at 11.  Both claims are without merit.

       1.    <u>Improper Response to Jury</u>

Petitioner claims that the trial court gave the jury an erroneous response to a question regarding the intent element of attempted murder, thereby violating his Sixth and Fourteenth Amendment rights.  Id. at. 7.  Petitioner's claim is without merit.

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  See <u>Estelle v. McGuire</u>, 502 U.S. 62, 71-72 (1991).  To obtain federal habeas relief for errors in the jury charge, the petitioner must show that the ailing state law instruction by itself so infected the entire trial that the resulting conviction violated due process.  See <u>id.</u> at 72.  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  See <u>id.</u>  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  <u>United States v. Frady</u>, 456 U.S. 152, 169 (1982) (citing <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977)).  If constitutional error is found, the reviewing habeas court must also find actual prejudice before relief may be granted.  See <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).  It must find that the error had a substantial and injurious effect or influence in determining the jury's verdict before relief may be granted.  See <u>id.</u>

Here, Petitioner challenges the trial court's response to a jury question regarding the intent element of his two attempted murder counts.  <u>Pet.</u> at 7.  The trial court instructed the jury with CALCRIM 251 and 600 on the attempted murder charges, as follows:

CALCRIM 251:

The [Petitioner] is charged in Counts 1 and 2 with attempted murder . . .

To prove the [Petitioner] [is] guilty of attempted murder, the People must prove that: 1. The [Petitioner] took at least one direct but ineffective step

United States District Court<br>For the Northern District of California

8

United States District Court
For the Northern District of California

toward killing another person; AND 2. The [Petitioner] intended to kill that person.

CALCRIM 600:

. . .

For you to find a person guilty of the crimes listed above or to find the allegations listed above true, that person must not only intentionally commit the prohibited act, but must do so with a specific intent.  The act and the specific intent are explained in the instructions for that crime or allegation.

CT 591-92.

During their deliberations, the jury submitted a question regarding the attempted murder instructions: "We, as a jury, have found a 'careless disregard for lethal consequences' in regards to counts 1, 2, 5, and 6.  We would like to further clarify the phrase 'intent to kill.'  Does a 'careless disregard for lethal consequence' constitute an 'intent to kill?'"  Id. at 550.  The court responded in writing, "Please refer to Instruction Numbers 251 and 600."  Id. at 551.  Counsel for Petitioner moved for mistrial on the grounds that the court should have affirmatively responded with "No . . . careless disregard does not constitute an intent to kill."  Answer (dkt. 10-1) at 7.  The court denied the motion for mistrial and placed the verdicts of guilty for the attempted murder counts on the record.  Id.  Petitioner raised the claim on direct appeal to the California Court of Appeal.

The California Court of Appeal considered and rejected Petitioner's claim as follows:

[Petitioner] claim[s] that the trial court's failure to properly respond to the jury's inquiry regarding the attempted murder counts violated Penal Code section 1138 and [his] right[] to due process. [He] maintain[s] that the trial court was obligated to respond to the jury's "careless disregard" inquiry with "a simple 'no.' " Because the jury was deadlocked on the attempted murder counts after three days of deliberations when it submitted this inquiry, and it reached a verdict not long after the court's response, [Petitioner] contend[s] that [he] [was] prejudiced by the court's response.

Penal Code section 1138 provides: "After the jur[ors] have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." "[T]he statute imposes a 'mandatory' duty to clear up any instructional confusion expressed by the jury." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212; *People v. Moore* (1996) 44 Cal.App.4th 1323, 1331 [court must "help the jury understand the legal

principles it is asked to apply"].)

"To perform their job properly and fairly, jurors must *understand* the legal principles they are charged with applying. It is the trial judge's function to facilitate such an understanding by any available means. The mere recitation of technically correct but arcane legal precepts does precious little to insure that jurors can apply the law to a given set of facts. A jury's request for reinstruction or clarification should alert the trial judge that the jury has focused on what it believes are the critical issues in the case. The judge must give these inquiries serious consideration. Why has the jury focused on this issue? Does it indicate the jurors by-and-large understand the applicable law or perhaps it suggests a source of confusion? If confusion is indicated, is it simply unfamiliarity with legal terms or is it more basically a misunderstanding of an important legal concept?" (*People v. Thompkins* (1987) 195 Cal.App.3d 244, 250.) "It is hardly preferable for a judge to merely repeat for a jury the text of an instruction it has already indicated it doesn't understand. We are convinced both jurors and the justice system will be well served in the vast majority of cases if the trial judge thoughtfully considers the jury's inquiry, clarifies it if necessary, studies the applicable legal principles, and responds to the jury in as simple and direct a manner as possible." (*Id.* at p. 253.)

In *People v. Beardslee* (1991) 53 Cal.3d 68 (*Beardslee* ), a jury inquired about the definition of premeditation and deliberation, and the court told the jury that it would not explain any of the jury instructions. On appeal, the defendant claimed that the trial court had violated Penal Code section 1138. (*Beardslee,* at pp. 96–97.) The California Supreme Court held that the court's response was erroneous. "The court has a primary duty to help the jury understand the legal principles it is asked to apply. [Citation.] This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. .... It must at least *consider* how it can best aid the jury. It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given." (*Beardslee,* at p. 97.) Although the California Supreme Court found that the trial court had erred, it concluded that the error was harmless because any ambiguity in the instructions would have favored rather than prejudiced the defendant, and it was mere "speculation" that the court's response might have discouraged the jury from asking further questions. (*Beardslee,* at pp. 97–98.)

 The Attorney General contends that the trial court did not abuse its discretion in deciding not to offer the jury any response other than a reference back to the original jury instructions. However, none of the cases relied upon by the Attorney General involved a properly instructed jury that nevertheless sent an inquiry to the court in which it proposed to use an improper legal standard. "The mental state required for attempted murder has long differed from that required for murder itself. Murder does not require the intent to kill. Implied malice—a conscious disregard for life—suffices. [Citation.] But ... implied malice cannot support a conviction of an *attempt* to commit murder." (*People v. Bland* (2002) 28 Cal.4th 313, 327.) Here, when the jury asked: "Does a 'careless disregard for lethal consequences' constitute an 'intent to kill?'", it was essentially asking if a "careless disregard" for life was sufficient to satisfy attempted murder's

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"intent to kill" element. This was a question of law that the trial court was obligated to affirmatively resolve. As [Petitioner] point[s] out, the correct answer was "No." Because, notwithstanding the fact that the jury had already received accurate instructions on the "intent to kill" element, the jury had still come to believe that "careless disregard" might satisfy the "intent to kill" element of attempted murder, the trial court had an obligation to debunk the jury's misapprehension of the jury instructions. Referring the jury back to instructions that it had clearly misunderstood was inadequate. We therefore conclude that the trial court erred in failing to respond "no" to the jury's inquiry.

The next question is whether the trial court's error was prejudicial. [Petitioner] contend[s] that the trial court's error was a violation of the Sixth Amendment because it amounted to an erroneous instruction on an element of the offense. We disagree with this characterization of the trial court's error. Although the court failed to properly respond "no" to the jury's inquiry, it did not give any inaccurate instructions on the elements of the offense. Indeed, the trial court's response to the jury's inquiry was to refer the jury back to accurate instructions on every element of the offense. Hence, the trial court's error was not a violation of the Sixth Amendment.

It follows that reversal is required only if it is reasonably probable that [Petitioner] would have attained a more favorable verdict if the court had properly responded "no" to the jury's inquiry. (*People v. Ainsworth* (1988) 45 Cal.3d 984, 1020.) The record does not support [Petitioner's] claim that a more favorable result was reasonably probable in the absence of the court's error.

The jury was properly instructed with CALCRIM No. 600, and the trial court referred the jury back to this correct instruction in response to its inquiry. Although CALCRIM No. 600 does not elaborate on the meaning of "intended to kill," it does not in any way suggest that "careless disregard" is the equivalent of "intended to kill." The evidence that [Petitioner] intended to kill was also very strong. [Petitioner and Scott] kicked open the door to Sagier's room, pointed guns at a defenseless Sagier, and fired at least five shots, at least two of which were hollow point .40 caliber bullets, a particularly lethal bullet. Sagier, who was standing on his bed, ducking, with his arm over his face, was struck in his upper thigh, which, given his position, was close to his vital organs. [Petitioner and Scott] did not flee after wounding Sagier but continued to Wilson's bedroom. Wilson was holding the doorknob when [Petitioner and Scott] tried to open the door, so they must have known that he was behind the door when one of them tried to turn the knob. Knowing this, they fired shots through the door, a foot above the doorknob, where one would expect to find the vital organs of someone who was holding the doorknob. Indeed, Wilson was struck by one bullet in the shoulder and by another in the face. The circumstances under which [Petitioner] fired the many shots they directed at Sagier and Wilson strongly supported a finding that [Petitioner] intended to kill both men.

Nor does the record suggest that the jury actually rested its verdict on a "careless disregard" theory rather than a finding that [Petitioner] intended to kill. The jury not only found [Petitioner] guilty of attempted murder under CALCRIM No. 600 but also found true allegations that [Petitioner] had acted willfully, deliberately, and with premeditation in the commission of the attempted murders. It is practically inconceivable that the jury could

11

> have concluded that [Petitioner] willfully, deliberately, and with premeditation acted with "careless disregard." Deliberation and premeditation are the very antithesis of "careless disregard."
>
>  As the evidence of intent to kill was very strong, and the jury's findings on the premeditation allegations were inconsistent with reliance on a "careless disregard" theory, the trial court's error in its response to the jury's inquiry was not prejudicial.

Scott, 2011 WL 2343268, at **8-10 (emphasis in original) (footnotes omitted).

The California Court of Appeal found that although the trial court erred in not answering the jury's question on specific intent, the error was harmless under the state-law standard discussed in People v. Ainsworth, 45 Cal. 3d 984, 1020 (1988), which cited and relied on People v. Watson, 46 Cal. 2d 818, 836 (1956). "[T]he Watson harmless error standard is the standard applied by the California state appellate courts in reviewing non-constitutional magnitude, trial type errors." Bains v. Cambra, 204 F.3d 964, 971 n.2 (9th Cir. 2000) (emphasis added). The state court, by finding that the instructional error was harmless under Watson in this case, implicitly determined that the error did not amount to a federal constitutional violation. The state court noted that the instructions given on the requisite specific intent were correct, that the evidence of intent to kill was very strong, and that the jury found true allegations that Petitioner acted willfully, deliberately and with premeditation. The state court's implicit determination that the error was not of constitutional magnitude was not objectively unreasonable. See 28 U.S.C. § 2254(d); Estelle, 502 U.S. at 72.

The California Court of Appeal's determination that the error was not prejudicial was also not objectively unreasonable. See 28 U.S.C. § 2254(d). The trial court's response did not give an inaccurate instruction on attempted murder, but only referred back to accurate instructions on every element of the offense. See RT 550, 592. The evidence of intent to kill was very strong, and included testimony by one of the victims who identified Petitioner and testified that he saw Petitioner standing in the doorway with a gun pointed "straight at [the victim]." Id. at 372-74. And importantly, the record shows that the jury found true allegations that Petitioner acted willfully, deliberately and with premeditation. Id. at 3609.

1   Under the circumstances, it simply cannot be said that the trial court's response (or rather

2   lack of a response) to the jury's question had a substantial and injurious effect or influence in

3   determining the jury's verdict.  See Brecht, 507 U.S. at 637.  Petitioner is not entitled to

4   federal habeas relief on his claim that the trial court gave the jury an erroneous response to a

5   question regarding the intent element of attempted murder.

6        2.    Failure to Give Accomplice Instruction

7        Petitioner claims that the trial court erred by not instructing the jury that  Carla

8   Pennix was an accomplice to the attempted murder and assault with a firearm counts, thereby

9   violating his Fourteenth Amendment rights.  Pet. at 12.  The claim is without merit.

10

11   A state court's refusal to give an instruction does not alone raise a ground cognizable

12   in a federal habeas corpus proceeding.  See Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir.

13   1988).  The error must so infect the trial that the defendant was deprived of the fair trial

14   guaranteed by the Fourteenth Amendment.  See id.  If there was error, a petitioner also must

15   show actual prejudice from the error, i.e., that the error had a substantial and injurious effect

16   or influence in determining the jury's verdict, before the court may grant federal habeas

17   relief.  See Calderon v. Coleman, 525 U.S. 141, 146 (1998) (citing Brecht, 507 U.S. at 637).

18        Here, Carla Pennix provided testimony surrounding the events of Petitioner's actions

19   during the night in question, including how Pennix drove Petitioner to the victims'

20   apartment, how Petitioner stated "nobody tries to take one of my bitches," and how she heard

21   gunshots from the apartment.  Pet. at 11-12.  Counsel for co-defendant Scott filed a motion in

22   limine requesting that Pennix be referred to as an accomplice or that the court instruct the

23   jury that her testimony must be corroborated by other evidence.  Id.  The court denied the

24   motion.  Id.  On appeal, Petitioner claimed, as he does here, that the trial court's failure to

25   instruct the jury that Pennix was an accomplice amounted to prejudicial error.

26        The California Court of Appeal rejected Petitioner's claim as follows:

27        [Petitioner] contend[s] that the trial court should have instructed the jury
         that Pennix was an accomplice to the attempted murder and assault with a
28        firearm counts. The trial court denied Scott's in limine request that it find

Pennix to be an accomplice.

"When there is sufficient evidence that a witness is an accomplice, the trial court is required on its own motion to instruct the jury on the principles governing the law of accomplices." (*People v. Frye* (1998) 18 Cal.4th 894, 965–966, disapproved on a different point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) These principles are "'(1) that the testimony of the accomplice witness is to be viewed with distrust [citation], and (2) that the defendant cannot be convicted on the basis of the accomplice's testimony unless it is corroborated....'" (*People v. Zapien* (1993) 4 Cal.4th 929, 982.) "However, a conviction will not be reversed for failure to instruct on these principles if a review of the entire record reveals sufficient evidence of corroboration." (*People v. Frye, supra,* 18 Cal.4th at pp. 965–966.) "'Such evidence "may be slight and entitled to little consideration when standing alone." [Citations.].... It is only required that the evidence ""tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the [accomplice] is telling the truth."'" [Citation.]'" (*People v. Sanders* (1995) 11 Cal.4th 475, 535.)

Even if we assume that the trial court erred in failing to give accomplice instructions as to Pennix's testimony regarding the assault and attempted murder counts, any error was harmless. Sagier identified [Petitioner] as the m[a]n who had assaulted him and Wilson with firearms. The distinctive sweatshirt that [Petitioner] was wearing at the time of the shootings was found in [Petitioner]'s residence. The prosecution also presented evidence, other than Pennix's testimony, that Scott had participated in disposing of the guns used in the shootings. While Pennix's testimony about the events leading up to the shootings was relevant to [Petitioner's] intent, evidence of the actual conduct of the shootings was far more probative of [Petitioner's] intent at that time, and it easily corroborated Pennix's testimony in that respect. Pennix's testimony merely suggested the reason why [Petitioner] w[as] upset with Wilson and Sagier. The fact that [Petitioner and Scott] used two guns, fired multiple shots, and pursued both occupants of the apartment, all of which was demonstrated by other evidence, was much stronger support for a finding that they intended to kill than was Pennix's testimony. Certainly it provided sufficient corroboration for her testimony. As the record contains sufficient evidence corroborating Pennix's testimony, any error in failing to give accomplice instructions was harmless.

<u>Scott</u>, 2011 WL 2343268, at *10 (footnotes omitted).

The California Court of Appeal determined that, even if the trial court erred in not giving accomplice instructions as to Pennix's testimony regarding the assault and attempted murder counts, "any error was harmless" because "the record contains sufficient evidence corroborating Pennix's testimony." <u>Id.</u> The state court's determination was not objectively unreasonable. <u>See</u> 28 U.S.C. § 2254(d). While Pennix's testimony was relevant, it was corroborated by Sagier's in-court identification of Petitioner as one of the two men who assaulted him and Wilson with firearms, and by Sagier's testimony of Petitioner's conduct

United States District Court
For the Northern District of California

14

during the shootings.  RT 354, 356, 358, 397.  Sagier also identified Petitioner's distinctive sweatshirt, which was discovered during a search of his home and contained gunshot residue. RT 1064.  Under the circumstances, it simply cannot be said that the trial court's refusal to give accomplice instructions as to Pennix's testimony regarding the assault and attempted murder counts had a substantial and injurious effect or influence in determining the jury's verdict.  See Brecht, 507 U.S. at 637.  Petitioner is not entitled to federal habeas relief on his claim that the trial court erred in not giving an accomplice instruction as to Pennix's testimony.

B.     Prosecutorial Misconduct

Petitioner claims that the prosecutor's misconduct during the trial deprived Petitioner of his due process right to a fair trial.  Pet. at 17.  The claim is without merit.

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." Darden v. Wainwright, 477 U.S. 168, 181 (1986); Smith v. Phillips, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").  Under Darden, the first issue is whether the prosecutor's conduct was improper; if so, the next question is whether such conduct infected the trial with unfairness. Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005).  But even then, federal habeas relief is in order only if the denial of due process based on prosecutorial misconduct had a substantial and injurious effect or influence in determining the jury's verdict.  See Brecht, 507 U.S. at 637.  Petitioners must establish that the misconduct resulted in "actual prejudice."  Id.

Here, Petitioner claims that the prosecutor's questioning of the investigating officer about her interrogation of Pennix was a series of "leading, irrelevant and speculative questions" that led to more than a "dozen objections from defense counsel" and "incurred the wrath of the trial judge." Pet. at 17.  He also claims that the prosecutor's "improprieties" continued during closing remarks, when he remarked to the jury, "When you are putting the devil on trial, you don't go to heaven for your witnesses," and when he trivialized the

United States District Court
For the Northern District of California

1  reasonable doubt standard.  Id.  The California Court of Appeal rejected Petitioner's

2  prosecutorial misconduct claims as follows:

> [Petitioner] argue[s] that the judgment must be reversed because the prosecutor committed prejudicial misconduct both in questioning the investigating officer and in closing argument.
>
> **1. Background**
>
> When the prosecutor was questioning the investigating officer, he tried to ask her questions aimed at showing that, when Pennix was interviewed by the police, the police previously had no knowledge of her involvement. His attempts were met with repeated objections, many of which were sustained. Eventually, a bench conference was held. The prosecutor explained that he was trying to bolster Pennix's credibility by showing that she had inculpated herself at a point when the police had no knowledge of her involvement. The court pointed out that many of his questions sought irrelevant information about when the investigating officer had learned a particular fact and if she had been "surprised" to learn it. "It's not relevant, and you have doggedly continued along this path despite my sustaining the objections." The prosecutor expressed a lack of understanding of the court's rulings. The following colloquy then occurred.
>
> "MR. CHEN [the prosecutor]: I don't understand. [¶] THE COURT: No, that's why you are ignoring my rulings. [¶] MR. CHEN: I'm not ignoring. [¶] THE COURT: You are absolutely in contempt of Court for ignoring my rulings. So you can continue on, if you like, and we will have a hearing later, or you can stop because that is my ruling. [¶] MR. CHEN: I was trying to ask whatever type of question gets around whatever issue. [¶] THE COURT: I just thought you didn't understand, but now that I'm explaining them to you. [¶] MR. CHEN: But I think for you to accuse me of contempt of court. [¶] THE COURT: You have just said you were ignoring my rulings. [¶] MR. CHEN: I didn't say I ignored your rulings. I said I didn't understand, and that's why I asked to approach, and now you are telling me what you are basing on, and I'm trying to convince you it is relevant. I wasn't ignoring. I've practiced before you before. I'm not that type of attorney, [to] just ignore what you are saying. I might not understand and try to figure a way around because maybe it's the way I'm phrasing it. [¶] THE COURT: I appreciate that. [¶] MR. CHEN: But that's why I was doing—I thought maybe I should ask it a different way. That's all it was. So you are saying all the facts that she received from Pennix that day which were new to her—[¶] THE COURT: I'm saying your line of questioning as to what this officer felt, was it surprising to her what Carla Pennix knew is not relevant. Now, if she did something based on Carla's statements, that's different. [¶] MR. CHEN: She did do something. Went back and got the records.
>
> "THE COURT: Victor [Chen], you are kind of starting your case all over again. You are at the end now, okay? [¶] MR. CHEN: I'm trying to tie it together. And maybe I don't practice law the same way you would like. [¶] THE COURT: There's no certain way that I would like. [¶] MR. CHEN: I'm not trying to be difficult, Your Honor. Your Honor, I'm surprised that you would ever accuse me of contempt. [¶] THE COURT: It is my opinion that you said that you were disobeying the order because you disagreed. [¶] MR. CHEN: If I said that, that's not what I meant. I meant that I didn't understand why you were doing it this way. I did not say I was going to

United States District Court
For the Northern District of California

ignore it. There have been rulings I haven't agreed with. [¶] THE COURT: Believe me, I know that. [¶] MR. CHEN: But my position whether I agree with the Court or not or a judge or not is never to purposely flaunt it or go against it. [¶] THE COURT: And I accept your statement."

After the bench conference, the prosecutor resumed his questioning of the investigating officer, and he did not return to the objectionable line of questioning.

After the close of evidence, the court instructed the jury: "Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case but their remarks are not evidence. Their questions are not evidence." Just before closing arguments began, the court reminded the jury "that what the attorneys say is not evidence." "If either attorney misstates the evidence or the law, you will rely on the evidence as presented in the trial and on the law as stated by me."

Scott's trial counsel argued to the jury that "the idea of reasonable doubt is a very alien concept" and "[y]ou never think in terms of beyond a reasonable doubt." He likened the reasonable doubt standard to the decision whether to take a loved one off of life support. The prosecutor responded in his closing argument. "They want you to rely on this onerous burden of proof that they call reasonable doubt and say, you know, reasonable doubt, nobody—" [Petitioner's] trial counsel interjected an objection. "I object to him labeling as onerous. That's improper. That's the law." The court stated: "That's his argument. The objection is overruled." The prosecutor proceeded to argue: "There are not two reasonable interpretations of the facts in this case. There just are not. There is one reasonable interpretation."

The prosecutor's closing argument also addressed [Petitioner's] attack on Pennix's credibility. "You know why she is my witness? Because I didn't pick her. These two guys did back in 2007. They are the ones who were friends with her. They are the ones who entrusted her with information such as being the get-away driver. They are the ones—they are the reasons why she is testifying in court. [¶] When you are putting the devil on trial, you don't go to heaven for your witnesses. These guys are the reason she is testifying." At this point, [Petitioner's] trial counsel objected. "Your Honor, I'm going to object if he is remotely suggesting my client is the devil. [¶] The jury should be admonished, and he needs to be cited for misconduct." The trial court immediately responded: "It did appear he was calling them, that is, it's a phrase he used, but your objection is sustained and the jury is admonished not to consider that for any reason." The prosecutor then backtracked. "My implication was not to impugn these people. It's a phrase. I will try to use that if you are trying to put someone on trial who is not a good person, the person who is most likely to be associated with them are people who are like minded. If you are going to commit a crime, you are not going to go and ask your pastor to be your get-away driver." [Petitioner's] trial counsel did not object to this explanation.

## 2. Analysis

"Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and when it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific

17

constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"" (*People v. Rundle* (2008) 43 Cal.4th 76, 157, disapproved on a different point in *People v. Doolin, supra*, 45 Cal.4th at p. 421, fn. 22.)

[Petitioner] make[s] three complaints about the prosecutor's conduct. First, [he] asserts that [the prosecutor] committed misconduct when he repeatedly asked questions of the investigating officer in an attempt to bolster Pennix's testimony. These questions were all parried with sustained objections, so no inadmissible evidence came before the jury, and the trial court properly instructed the jury that questions by the attorneys were not evidence. "When a trial court sustains defense objections and admonishes the jury to disregard the comments, we assume the jury followed the admonition and that prejudice was therefore avoided." (*People v. Bennett* (2009) 45 Cal.4th 577, 595.) The prosecutor's failed attempts to adduce evidence could not have prejudiced [Petitioner] as the court sustained the defense objections and instructed the jury not to consider the prosecutor's questions.

Second, [Petitioner] point[s] to the prosecutor's comment: "When you are putting the devil on trial, you don't go to heaven for your witnesses." Again, the court sustained the defense objection and admonished the jury to disregard the prosecutor's comment, so no prejudice could have occurred. This was not such an inflammatory comment that the admonition cannot be relied upon.

Third, [Petitioner] identif[ies] as misconduct the prosecutor's assertion that [Petitioner] "want[s] you to rely on this *onerous burden of proof that they call reasonable doubt* ...." (Italics added.) In this instance, the defense objection was overruled. [Petitioner] contend[s] that the prosecutor's comment "mocked and trivialized" the reasonable doubt standard. Viewed in context, however, the prosecutor's remark was a fair response to the defense argument that the reasonable doubt standard was "a very alien concept" that jurors would "never think in terms of" unless they had to decide whether to take a loved one off of life support. "A prosecutor is given wide latitude during closing argument." (*People v. Harrison* (2005) 35 Cal.4th 208, 244 (*Harrison* ).) "When the issue 'focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" (*Ibid.*) It is highly unlikely that the jury construed the prosecutor's comment as anything other than a response to the defense argument that the reasonable doubt standard was "a very alien concept." The prosecutor did not otherwise misstate the burden or standard of proof, and the jury was accurately instructed on these concepts. We decline to find any prejudicial misconduct in this remark.

Scott, 2012 WL 2343268 at **11-13 (footnotes omitted).

The California Court of Appeal carefully examined Petitioner's prosecutorial misconduct claims and determined that there was no prejudicial misconduct. The state court's determination was not objectively unreasonable. See 28 U.S.C. § 2254(d). During

United States District Court
For the Northern District of California

the prosecutor's questioning of the investigating officer, the record shows that the prosecutor's continued questions reflected that he did not understand the reason for the sustained objections; but once he discussed and clarified the matter with the presiding judge, he did not return to the objectionable line of questioning. RT 2435-41. This does not suggest misconduct. And, more importantly, the questioning did not amount to a due process violation or prejudiced Petitioner because the court instructed the jury not to consider the prosecutor's questions. See Greer v. Miller, 483 U.S. 756, 766 n.8 (1987) (if curative instruction is given, reviewing court presumes that jury disregarded inadmissible evidence and that no due process violation occurred); Trillo v. Biter, No. 11-15463, slip op. at 8 (9th Cir. June 16, 2014) ("We presume that juries listen to and follow curative instructions from judges."). Similarly, the prosecutor's "putting the devil on trial" comment did not amount to a due process violation or prejudiced Petitioner because the court instructed the jury to disregard the prosecutor's comment. See id. Finally, Petitioner's claim that the prosecutor "trivialized" the reasonable doubt standard did not amount to a due process violation or prejudiced Petitioner because it is not reasonably likely that the jury construed the prosecutor's comment as anything other than a response to the defense's argument that the reasonable doubt standard was a very alien concept. See Brecht, 507 U.S. at 637; see also Donnelly v. DeChristoforo, 416 U.S. 637, 647 (1974) ("a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from a plethora of less damaging interpretations"). This is especially true because the prosecutor did not misstate the burden or standard of proof, and the jury was accurately instructed on the standard. RT 309, 3392. Petitioner is not entitled to federal habeas relief on his claims of prosecutorial misconduct.

C.    Insufficiency of the Evidence

    Petitioner claims there was insufficient evidence to support his pimping and pandering convictions. Pet. at 23. Petitioner's claim is without merit.

United States District Court
For the Northern District of California

A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt states a constitutional claim, which, if proven, entitles him to federal habeas relief. Jackson v. Virginia, 443 U.S. 307, 321, 324 (1979). But the Supreme Court has emphasized that "Jackson claims face a high bar in federal habeas proceedings." Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012). A federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992) (quoting Jackson, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt has there been a due process violation. Jackson, 443 U.S. at 324; Payne, 982 F.2d at 338. The Jackson standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law. Jackson, 443 U.S. at 324 n.16.

Under 28 U.S.C. § 2254(d), sufficiency of the evidence claims on federal habeas review are subject to a "twice-deferential standard." Parker v. Matthews, 132 S. Ct. 2148, 2152 (2012). First, relief must be denied if, viewing the evidence in the light most favorable to the prosecution, there was evidence on which "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (quoting Jackson, 443 U.S. at 324). Second, a state court decision denying a sufficiency challenge may not be overturned on federal habeas unless the decision was "objectively unreasonable." Id. (quoting Cavazos v. Smith, 132 S. Ct. 2, 4 (2011)).

The California Court of Appeal summarized and rejected Petitioner's insufficiency of the evidence claim as follows:

> [Petitioner] asserts that his pimping conviction is not supported by substantial evidence that he was partially supported by Torres's earnings. He claims that his pandering conviction is not supported by substantial evidence that he "procured" or "influenced" Torres to work as a prostitute.
>
> "'[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v.*

United States District Court
For the Northern District of California

*Johnson* (1980) 26 Cal.3d 557, 576, quoting *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319.) "[The] appellate court must view the evidence in the light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425; accord *People v. Pensinger* (1991) 52 Cal.3d 1210, 1237.) "Evidence is sufficient to support a conviction only if it is substantial, that is, if it ' "reasonably inspires confidence" ' [citation], and is 'credible and of solid value.' " (*People v. Raley* (1992) 2 Cal.4th 870, 890–891.)

Pimping is committed when a person, "knowing another person is a prostitute, lives or derives support or maintenance in whole or in part from the earnings or proceeds of the person's prostitution...." (Pen.Code, § 266h, subd. (a).) Pandering is committed when a person "[p]rocures another person for the purpose of prostitution." (Pen.Code, § 266i, subd. (a)(1).) "[T]he term 'procure' means assisting, inducing, persuading or encouraging" a person to engage in prostitution. (*People v. Schultz* (1965) 238 Cal.App.2d 804, 812.)

[Petitioner] had provided Torres with the cell phone that she was using to solicit prostitution clients. The cell phone found on her person when she was arrested had a picture of [Petitioner] on it, and the carrying case for that phone bore the word "Pimp." Torres had a tattoo on her breasts that read:

" 'Larry aka Lotto.' " [Petitioner's] first name is Larry. McNulty told the police that Torres worked for [Petitioner] as a prostitute. Pennix testified that [Petitioner] "was pimping girls," including Torres, and that these girls were providing [Petitioner] with some of the proceeds from their prostitution. [Petitioner] arranged for and paid for the cost of transporting Torres to and from appointments with her prostitution clients.

[Petitioner] argues on appeal that Pennix's testimony was "speculative at best" and therefore could not support the pimping count. We disagree. Pennix testified that she was romantically involved with [Petitioner], spent time with him on a daily basis, and participated in his pimping business by transporting his prostitutes to their appointments. She also spent time with [Petitioner] and the prostitutes at the motels where they stayed. Pennix transported Torres and Hildebrand to their appointments with Wilson and Sagier on the night of the shootings. We see nothing "speculative" about Pennix's testimony regarding her personal knowledge of [Petitioner]'s pimping business. Her testimony that [Petitioner]'s prostitutes, including Torres, were providing [Petitioner] with a portion of their prostitution earnings was sufficient to support the pimping count.

With respect to the pandering count, [Petitioner] contends that there was no evidence that he specifically intended to and did procure or influence Torres to be a prostitute. We disagree. "It is immaterial whether the female 'procured' is an innocent girl or a hardened prostitute of long experience." (*People v. Montgomery* (1941) 47 Cal.App.2d 1, 12, disapproved on other grounds in *People v. Zambia* (2011) 51 Cal.4th 965, 981, *People v. Dillon* (1983) 34 Cal.3d 441, 454, fn. 2, and *Murgia v. Municipal Court* (1975) 15 Cal.3d 286, 301, fn. 11.) [Petitioner] provided Torres with a cell phone and transportation specifically directed at facilitating her prostitution activities from which he benefitted. (*People v. Hobson* (1967) 255 Cal.App.2d 557, 561 [providing car for prostitution business was sufficient to show procurement].) He referred to her as "one of my bitches." A jury could

21

1

> reasonably infer that [Petitioner] provided his "bitch[ ]" with a cell phone
> and transportation to encourage and assist her to engage in acts of
> prostitution with the specific intent to influence her to engage in prostitution
> and that he was successful in doing so.

2

3

4  Scott, 2012 WL 2343268 at **13-14.

5

6    The California Court of Appeal's rejection of Petitioner's insufficiency of the

evidence claim was not objectively unreasonable.  See 28 U.S.C. § 2254(d); Cavazos v.

7  Smith, 132 S. Ct. at 4.  Petitioner was convicted of one count of pimping and one count of

8  pandering.  Pimping is committed when a person, "knowing another person is a prostitute,

9  lives or derives support or maintenance in whole or in part from the earnings or proceeds of

10 the person's prostitution."  Cal. Penal Code § 266h(a).  Pandering is committed when a

11 person "[p]rocures another person for the purpose of prostitution."  Cal Penal Code § 266i(a).

12   As to the pimping count, Petitioner argues that there was insufficient evidence to

13 prove the element that Petitioner derived support from Torres because none of the witnesses

14 testified that "they saw any money change hands" between Torres and Petitioner.  Pet. at 24.

15 But Pennix testified that Petitioner was "pimping girls" and that the girls were providing

16 Petitioner with some of their proceeds from the prostitution.  RT 2113.  There was nothing

17 "speculative" about Pennix's testimony regarding her personal knowledge of Petitioner's

18 pimping business.  In fact, much of it was corroborated by other evidence, such as Petitioner

19 providing Torres with a cell phone to solicit prostitution.  RT 1516.  Viewing the evidence in

20 the light most favorable to the prosecution, it simply cannot be said that no rational trier of

21 fact could have found that Petitioner was guilty of pimping beyond a reasonable doubt.  See

22 Jackson, 443 U.S. at 324.

23

24   As to the pandering count, Petitioner argues that there was no evidence that he

25 "procured" Torres to work as a prostitute.  Pet. at 25.  Not so.  The record makes clear that

the prosecution presented evidence that Petitioner provided Torres with a cell phone,

26 transportation, and hotel arrangements for the purpose of facilitating Torres' prostitution

27 activities from which Petitioner benefitted.  RT 1516, 2113-25.  Petitioner also referred to

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Torres as "one of my bitches."  RT 2129.  Viewing the evidence in the light most favorable to the prosecution, it simply cannot be said that no rational trier of fact could have found that Petitioner was guilty of pandering beyond a reasonable doubt.  See Jackson, 443 U.S. at 324.

Petitioner is not entitled to federal habeas relief on his claim of insufficiency of the evidence.  It simply cannot be said that the state court's rejection of the claim was objectively unreasonable.  See 28 U.S.C. § 2254(d); Cavazos, 132 S. Ct. at 4.

D.     Cumulative Error

Petitioner claims that the cumulative effect of the errors so infected the trial with unfairness that he was denied his due process right to a fair trial.  The claim is without merit.

The California Court of Appeal rejected Petitioner's cumulative error claim in a footnote:

> [Petitioner] also contend[s] that there was cumulative prejudice from the trial court's errors and the prosecutor's misconduct. None of the errors in this case caused any significant prejudice to [Petitioner] either individually or cumulatively, so we reject their claim of cumulative prejudice.

Scott, 2012 WL 2343268 at *13 n.15.

The Ninth Circuit has held that in exceptional cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several trial errors may prejudice a defendant so much that his conviction must be overturned.  See Alcala v. Woodford, 334 F.3d 862, 893-95 (9th Cir. 2003).  This is not one of those cases.  The California Court of Appeal rejected petitioner's cumulative error claim, noting that none of the errors in the case caused any significant prejudice to Petitioner either individually or cumulatively.  Scott, 2012 WL 3243268 at *13 n.15.  It is also important that the state court found no error of constitutional magnitude.  Cf. Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011) (if there was "no error of constitutional magnitude occurred, no cumulative prejudice is possible").  Under the circumstances, it simply cannot be said that the state court's rejection of Petitioner's cumulative error claim was contrary to, or an unreasonable application of, clearly established Supreme Court precedent, or was based on an

unreasonable determination of the facts.  <u>See</u> 28 U.S.C. § 2254(d).  Petitioner is not entitled to federal habeas relief on his claim of cumulative error.

### CONCLUSION

After a careful review of the record and pertinent law, the Court is satisfied that the petition for a writ of habeas corpus must be DENIED.

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of appealability (COA) under 28 U.S.C. § 2253(c) also is DENIED because Petitioner has not demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

The clerk shall enter judgment in favor of Respondent, terminate all pending motions as moot and close the file.

**SO ORDERED.**

DATED:  <u>July 16, 2014  </u>

_____
CHARLES R. BREYER
United States District Judge